UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NELSON CASTANEDA,<br><br>Defendant. | Case No. 18-cr-00493-SI-1<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 12 |

On November 16, 2018, the Court held a hearing on defendant's motion to suppress evidence. For the reasons set forth in this order, the Court GRANTS defendant's motion.

**BACKGROUND**

The following facts are taken from the parties' exhibits and declarations, including street video surveillance footage,[1] the police officers' "body cam" video footage, and the "C.A.D." police audio related to the incident.[2] At approximately 12:50 p.m. on September 22, 2018, San Francisco Police Officers Paul Ruetti and Murray Daggs were driving in a marked patrol car through the intersection of Turk and Hyde Streets in San Francisco when a group of men flagged

---

[1] The footage is a compilation of surveillance footage from business establishments in the Tenderloin District of San Francisco on September 22, 2018. Narayan Decl., Ex. 4 (Dkt. No. 16-1). The government states that following the events that gave rise to this case, a San Francisco Police Department investigator canvassed the area and obtained the footage from the businesses. Govt's Opp'n at 5 (Dkt. No. 15).

[2] Defendant submitted a disk containing the "C.A.D." audio recording, as well as the written C.A.D. report, which is a time-stamped transcription of the recording. Although the parties have not explained what "C.A.D." stands for, it appears to be Computer Assisted Dispatch records including a recording (and written transcript) of the police officers' internal radio and dispatch communications related to the events of September 22, 2018.

down the officers. Officer Ruetti's declaration describes the encounter as follows:

> 4. On September 22, 2018, along with my partner, SFPD Officer Murray Daggs, I was on routine patrol in the Tenderloin district of San Francisco.[3] Officer Daggs and I were in a marked patrol vehicle. Officer Daggs was driving, and I was in the passenger seat. We were both in full police uniform.
>
> 5. At about 12:50 p.m., as Officer Daggs and I were passing the intersection of Turk Street and Hyde Street in our marked police vehicle, a group of several males flagged us down. Officer Daggs put the car in reverse and drove Eastbound on Turk Street until we were close to the intersection of Hyde Street, even with the group of males.
>
> 6. I immediately noticed that the men seemed frantic and nervous. I also noticed that the men were primarily Hispanic and speaking in broken English. Neither Officer Daggs nor I spoke Spanish. The men were shouting about a gun and pointing Northward, up Hyde street, towards another group of men. I heard one of the men say the word "gangster," and I recall one of the other men saying something about a white T-shirt. I attempted to get additional details about what had happened, but due to the language barrier and the frantic demeanor of the men, I was only able to comprehend that at least one of the men in the other group had a gun. I did recognize some of the men in the reporting group from prior police contacts in the Tenderloin. In particular, I had previously suspected one of the reporting men of being involved in drug distribution in the Tenderloin. However, based on what I perceived to be genuine fear and agitation among the reporting men, I believed their report was credible, and I assessed the situation to be an emergency. I believed that someone in the other group had a gun, and there were many civilian pedestrians out and about in this area of the Tenderloin. I also knew that, should the need arise, I could track down some of the reporting men in the future to follow up on their information.
>
> 7. I began heading Northbound on Hyde on foot, in the same direction the reporting men had pointed.[4] Officer Daggs activated his emergency lights and began driving Northbound on Hyde, which was against traffic on a one-way street. By this time, the men that the eyewitnesses had pointed to were near the intersection of Hyde Street and Eddy Street, a full block away. They were too far away for me to see their faces, but I could see that they were either white or Hispanic men. Officer Daggs and I then noticed that one of the men, wearing a white T-shirt, had turned East on Eddy Street, whereas the remaining men continued Northbound on Hyde Street. I turned East on Eddy Street to assist Officer Daggs with a weapons pat down on the man with the white T-Shirt. This caused me to lose sight of the remaining men headed Northbound on Hyde. I reported over the radio to dispatch that the remaining suspects were heading Northbound on Hyde so that other officers could assume surveillance.

---

[3] Officer Ruetti also states, "From my training and experience, I know that the Tenderloin is a high crime area. I know that gun crime and drug crime are more prevalent in the Tenderloin than in many other areas of the city." Ruetti Decl. ¶ 3.

[4] The video surveillance footage shows that when Officer Ruetti walked north on Hyde Street, at least nine men who were in the "reporting" group immediately and closely followed him. Narayan Decl., Ex. 4 (Dkt. 16-1) (surveillance video at 7:02-7:25).

2

> 8. The pat down of the man in the white T-shirt did not yield a weapon, which led me to believe that one of the other men in the group headed Northbound on Hyde Street may have the gun. . . .

Ruetti Decl. ¶¶ 3-8 (Dkt. No. 16-1, Ex. 1).

According to the written C.A.D. report, prior to the officers' detention of defendant Nelson Castaneda, the officers stopped and frisked three other individuals, including the man in the white-shirt mentioned in Officer Ruetti's declaration. *See* Falk Decl., Ex. G (Dkt. No. 20-2) (written C.A.D. report at 12:52, "about to take him on"; referring to man in white t-shirt who walked east on Eddy Street toward Leavenworth Street); *id.* at 12:53-12:56 ("will check that out" and "no 221 for subj with the whi hat," referring to a man wearing a white baseball hat near Hyde and Ellis Streets); *id.* at 12:55 ("1 detd with red hat" around O'Farrell and Larkin Streets). As defendant notes, the video surveillance showing the "non-reporting" group of men walking north on Hyde Street does not show anyone wearing a red hat. *See* Narayan Decl., Ex. 4 (surveillance video at 7:35-8:09) (Dkt. No. 16-1).

Officer Ruetti's declaration continues,

> 8. . . . Around the same time, a San Francisco Sheriff's Unit reported over the radio that the group I had reported was heading Northbound on Hyde Street had turned West on O'Farrell Street and were now walking Westbound on O'Farrell Street.[5] Based on this report over dispatch, Officer Daggs and I circled back to O'Farrell Street in our police vehicle and caught up with the three men. As I began to get out the vehicle to make contact with the men, one of them, later identified as the defendant, Nelson Castaneda, turned and looked back at me. He had a startled expression on his face that I would describe as a "deer in the headlights" look. He immediately separated himself from the other two men and quickly entered the nearest establishment, which was a restaurant called Piccolo Italia Pizza. I followed him into the restaurant, and I noticed that he had proceeded directly to the stock supply room in the back of the restaurant, rather than attempting to order food. I believed that he was attempting to evade me and hide from me, and based on the totality of the circumstances, I believed that he was in possession of a firearm. I also noticed that there were other civilians in the restaurant, and I was concerned for their safety as well. I unholstered my firearm and kept it at low-ready position, which allowed me to be prepared for any threats. Around the time I entered the restaurant, officer Paul Vainshtok arrived as backup. He entered the restaurant around the same time as me.

Ruetti Decl. ¶ 8-9 (Dkt. No. 16-1, Ex. 1).

Defendant disputes Officer Ruetti's description of Castaneda's behavior. Castaneda states

---

[5] The written C.A.D. report at 12:54 states "WB [O'Farrell] . . Group of Three." Falk Decl., Ex. G (Dkt. No. 20-2).

in his declaration,

> 2. On September 22, 2018, I walked up Hyde Street towards O'Farrell Street because the car I was driving was parked on Myrtle. I was wearing a black sweatshirt, a black t-shirt, and black pants.
>
> 3. My plan and purpose in turning up O'Farrell Street from Hyde was to stop and get a piece of pizza at the restaurant on the corner, which I've been to many times. I also know from eating there that there is a restroom in the back and I needed to go before getting in the car.
>
> 4. I walked directly up O'Farrell and was almost to the pizza shop when I heard police sirens and the sound of tires on pavement from behind me. Because O'Farrell is a one-way street headed east, and the sound came from behind me (I was walking west), I turned around to see what was going on. Police cars were driving up the wrong way on this one way street, which was not an ordinary thing. So I turned around to look.[6]
>
> 5. I then entered the pizza shop as planned. I did not make a "deer in the headlights" face and certainly did not run or quickly "duck" into the pizza shop. I entered the pizza shop like any patron would. I had no idea the police were going to follow me into the restaurant.
>
> 6. I went to the back of the pizza shop because that is where the restroom is. The police were not close behind me at the point I entered the back room of the pizza shop. I did not go to the back room to hide from the police. I went to the back room to use the restroom.
>
> 7. Someone was coming out of the bathroom so I had to wait a second. I was then going to enter the restroom when I heard "police stop!" I turned and saw 3 to 4 officers, at least two with guns drawn. I stopped and followed their commands. I didn't want to get shot.

Castaneda Decl. ¶¶ 2-7 (Dkt. No. 22).

Officers Ruetti and Vainshtok encountered Castaneda in the rear supply room of the restaurant where the bathroom was located, and another officer stood in the supply room and a fourth officer stood near the doorway between the supply room and the main room of the pizza shop. Falk Decl., Ex. E (Ruetti's body cam video at :00-:05) (Dkt. No. 20-1); *see also* Portman Decl. ¶ 2, Ex. H-M (Dkt. No. 21) (pictures of interior of Piccolo Italia Pizza showing, *inter alia*, the supply room with a door marked "restroom"). Officer Ruetti's body cam footage shows that

---

[6] The video surveillance from O'Farrell Street shows that several people turned around and/or stopped to look at the officers' patrol car. Narayan Decl., Ex. 4 (surveillance video at 9:08-9:20) (Dkt. No. 16-1). The footage shows the patrol car drove down O'Farrell Street and parked part way down the block, and footage from a different part of O'Farrell Street shows Officer Ruetti running down O'Farrell Street past several shops before entering Piccolo Italia Pizza, which is at the corner of O'Farrell and Larkin Streets. *Id*. at 9:55-10:08.

4

Officer Ruetti turned Castaneda around and that Officer Vainshtok held Castaneda's wrists behind his back while Officer Ruetti proceeded to search Castaneda. Falk Decl., Ex. E (Ruetti's body cam video at :00-:05). Officer Ruetti states,

> 9. I made contact with Castaneda in the supply room and activated my body worn camera. I then conducted a pat down of Castaneda's outer clothing for weapons. I felt a hard metal object, which I believed was a weapon, near Castaneda's front right hip. I lifted Castaneda's sweatshirt to retrieve the weapon, and I saw that it was a knife. I then continued the weapons pat down. As I touched the outside of Castaneda's front right pants pocket, I felt what I immediately recognized to be drugs. Through Castaneda's pocket, I could feel several small, round objects, which felt distinctively to me like single-use drug bindles packaged for sale. I knew this due to the many times (over one hundred) that I have seized similarly packaged narcotics from arrestees during my time as a police officer. After I felt the drugs, I reached into Castaneda's pocket to remove the contraband. I removed ten individually wrapped bindles of heroin and five individually wrapped baggies of cocaine.[7]
>
> 10. I had probable cause to believe that Castaneda had both carried a concealed weapon (the knife) in violation of San Francisco Municipal Police Code, and possessed drugs for sale, in violation of the California Health & Safety Code. In my experience as a police officer, I know that ten individually wrapped bindles of heroin and five individually wrapped baggies of cocaine are indicative of drug distribution. It is uncommon for drug users to carry this many doses of hard drugs at one time. On the other hand, it is common for drug dealers to carry multiple individually packaged drug bindles at a time, so that they can easily sell them in single-use quantities to customers. In addition, most heavy drug users carry drug use paraphernalia - such as pipes, straws, or needles - on their person. Castaneda did not have any drug use paraphernalia in his possession.
>
> 11. I placed Castaneda under arrest and conducted a full search of Castaneda incident to arrest. In addition to the knife and drugs I already mentioned, I found metal knuckles, cash, a cell phone, and a set of Dodge car keys in Castaneda's pockets. Before I transported Castaneda to Tenderloin station, I handed the Dodge car keys I had seized from Castaneda's pocket to Officer Vainshtok and Officer Faulkner. I asked Officer Vainshtok and Officer Faulkner to attempt to locate a nearby car associated with the keys. I know, from my training and prior experience as a police officer and from patrolling the Tenderloin, that it is common for drug dealers to store drugs and weapons in their nearby vehicles.

Ruetti Decl. ¶¶ 9-11. Officer Ruetti's body cam video shows that while Castaneda was being

---

[7] Officer Ruetti's body cam footage shows a slightly different chronology. The footage shows that Ruetti lifted Castaneda's sweatshirt, revealing Castaneda's bare chest and stomach. Officer Ruetti then patted Castaneda's groin and crotch area, then patted Castaneda's right pocket. Officer Ruetti then used the tips of his fingers to wiggle and manipulate the bottom of Castaneda's right pocket, then patted the pocket again and reached into the pocket and pulled out a folded knife, which he placed on the table next to Castaneda. Officer Ruetti did not unfold the knife during the search. After Officer Ruetti removed the knife, he reached into Castaneda's right pocket and removed the drugs. Falk Decl., Ex. E (Ruetti's body cam video at :00-:35).

5

handcuffed, Ruetti asked him "Do you normally just run?", and that Castaneda denied running. Officer Ruetti then said, "Or, dip into pizza shops, or go wherever you feel like?" Castaneda responded that he was "just going to get some pizza" and again denied running. Falk Decl., Ex. E (Ruetti's body cam video at 1:12-1:25).

After Officer Ruetti arrested Castaneda, Ruetti gave Officers Vainshtok and Faulkner the Dodge car keys seized from Castaneda's pocket. Ruetti Decl. ¶ 11; Faulkner Decl. ¶ 4. Officer Faulkner states in his declaration:

> 4. . . . I was told by Officers Ruetti and Vainshtok that a distribution quantity of drugs, in addition to weapons, were found in Castaneda's pockets. Officer Vainshtok and I then attempted to determine if there was a nearby car belonging to Castaneda. About 200 feet away from the restaurant, we located a white Dodge Dart, at Myrtle Street and Larkin Street, that responded to the unlock button on the key fob seized from Castaneda's pocket. We ran the license plate number of the Dodge, and the registered owner came back to two names: "Olga Nevarez" and "Mario Castaneda-Nevarez."[8] Officer Vainshtok and I then conducted a probable cause search of the car for drugs and weapons. In my experience as a police officer in the Tenderloin, it is common for drug dealers to store additional drugs in nearby vehicles. It is also common for people in the Tenderloin in possession of weapons to store additional weapons in their vehicles.
>
> 5. I searched the trunk of the car while Officer Vainshtok searched the front part of the car. In the trunk, I found a black plastic bag. Inside the black plastic bag, I found a loaded Kimber Micro .380 caliber pistol, with no readable serial number.

Faulkner Decl. ¶¶ 4-5 (Dkt. No. 16-1, Ex. 2)

Later the same day, officers obtained a warrant to search Castaneda's residence at 3090 16th Street, Apt. 202 in San Francisco, as well as the Dodge Dart that Officers Faulkner and Vainshtok had searched without a warrant. Falk Decl., Ex. B (Search Warrant and Affidavit at NC-149-154) (Dkt. No. 8-2). San Francisco Police Officer Ronald Gilson prepared the search warrant application and Statement of Probable Cause. The Statement of Probable Cause stated, *inter alia*,

> On today's date, I spoke with Officers Ruetti #521 and Daggs #1650 regarding this incident. On 09/22/2018 at approximately 1250 hours, Officers Daggs #1650 and Ruetti #521 were on patrol in full police uniforms while driving a fully marked

---

[8] Defendant's sister-in-law, Lydia Rodriguez, has filed a declaration stating that she is the registered owner of the vehicle, and that Castaneda had her permission to drive the vehicle. Rodriguez Decl. ¶¶ 1-3 (Dkt. No. 9). The government does not dispute that Castaneda has standing to challenge the search of the vehicle.

> police vehicle. They were driving west on Turk Street near the intersection of Hyde Street. Numerous unknown Hispanic male witnesses standing near the northwest corner of the intersection of Turk Street and Hyde Street flagged these officers down. These witnesses advised Officers Daggs and Ruetti that they observed a group of Hispanic male gang members and further stated that these gang members were in possession of a firearm. The reporting witnesses pointed towards a group of Hispanic male subjects who were walking northbound on the west sidewalk of Hyde Street towards Eddy Street to indicate they were the group they were referring to.

*Id*. at NC-000152. The evidence in support of the Statement of Probable Cause consisted of the drugs and weapons seized from Castaneda and the warrantless search of the Dodge Dart. *Id*. The Statement of Probable Cause also stated that Castaneda was a "documented Sureno gang member" and that Castaneda "is a multiple time convicted felon for narcotics and aggravated battery out of San Francisco (CRT#14007693, 03-14-2014), thereby making him a prohibited person from possessing firearms." *Id*. During the search of 3090 16th Street, Apt. 202, officers seized, *inter alia*, drug paraphernalia, currency, a Springfield .45 pistol with three magazines and unfired cartridges and bullets, an AR-18 rifle, and a high capacity magazine. *Id*. at NC-000151.

On October 9, 2018, Castaneda was indicted on two counts of violation of 18 U.S.C. § 922(g), felon in possession of a firearm. Count 1 of the indictment relates to the firearm recovered from the warrantless search of the Dodge Dart and Count 2 relates to the two firearms recovered from Castaneda's residence pursuant to the search warrant. Dkt. No. 1.

## DISCUSSION

Defendant challenges the warrantless search and seizure of his person, the warrantless search of the Dodge Dart, and the subsequent search of his residence pursuant to a warrant that defendant contends was tainted by the previous searches. Defendant contends that he was unlawfully arrested prior to the search of his pockets because Officers Ruetti and Daggs held him at gunpoint in the back of the pizza shop while two other officers stood nearby, and a reasonable person would not have believed that he was free to leave. Defendant argues that even if the initial detention was a "*Terry* stop"[9] rather than an arrest, the officers lacked reasonable suspicion for the

---
[9] In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court "held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks

7

stop and frisk. Defendant also contends that even if the *Terry* stop was constitutional, the officers never developed probable cause on the scene to arrest Castaneda for possession of the knife in violation of San Francisco Municipal Code § 1291(b) because Castaneda was not loitering and the officers did not open the knife to measure its length.[10] Defendant also argues that the drugs were unlawfully seized because Officer Ruetti's wiggling and manipulation of Castaneda's right pocket exceeded the scope of a *Terry* pat search. Finally, defendant argues that there was no probable cause for an automobile exception search where small personal use quantities of drugs are found on an individual and the automobile is located on a different alley around the corner from the

---

probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). "After stopping an individual based on reasonable suspicion, an officer may also conduct a limited pat down, or frisk, if he believes that 'the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous.'" *United States v. Job*, 871 F.3d 852, 861 (9th Cir. 2017) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)).

[10] That section provides:

SEC. 1291. Prohibiting Loitering While Carrying Concealed Weapons. (a) As used in this section, but in no wise limited thereto, "dangerous or deadly weapon" shall mean: Any knife with a blade three inches or more in length; any spring-blade, switch-blade, or snap-blade knife or other similar type knife; any knife any blade of which is automatically released by a spring mechanism or other mechanical device; any ice pick, or similar sharp, stabbing tool; any straight edge razor or any razor blade fitted to a handle; any cutting, stabbing, bludgeoning weapon or device capable of inflicting grievous bodily harm.

(b) It shall be unlawful for any person, while carrying concealed upon his person any dangerous or deadly weapon, to loaf or loiter upon any public street, sidewalk, or alley, or to wander about from place to place, with no lawful business thereby to perform, or to hide, lurk, or loiter upon or about the premises of another.

(c) It shall be unlawful for any person who has concealed upon his person or who has in his immediate physical possession any dangerous or deadly weapon to engage in any fight or to participate in any other rough or disorderly conduct upon any public place or way or upon the premises of another.

(d) It shall be unlawful for any person who has concealed upon his person any dangerous or deadly weapon to loiter about any place where intoxicating liquors are sold or any other place of public resort.

(e) The foregoing restrictions shall not be deemed to prohibit the carrying of ordinary tools or equipment carried in good faith for uses of honest work, trade or business or for the purpose of legitimate recreation.

*Yuen v. Mun. Court*, 52 Cal. App. 3d 351, 353-54 (Ct. App. 1975).

8

arrest site.

The government defends the initial search and seizure of Castaneda as a permissible *Terry* stop and frisk because officers had reasonable suspicion to believe that Castaneda was armed and dangerous. The government contends that once Officer Ruetti found the concealed knife on Castaneda, he had probable cause to arrest Castaneda for a violation of San Francisco Municipal Code § 1291(b). The government asserts that Officer Ruetti's seizure of the drugs from Castaneda's pockets was permissible as a search incident to arrest following the discovery of a concealed knife and under the plain feel doctrine set forth by the Supreme Court in *Minnesota v. Dickerson*, 508 U.S. 366 (1993). The government also argues that officers had probable cause to believe that the Dodge Dart would contain contraband, and thus that the search of the vehicle was justified under the automobile exception to the warrant requirement. Finally, the government argues that because the officers properly seized drugs and weapons during the warrantless searches of Castaneda and the Dodge Dart, the subsequent search of Castaneda's residence pursuant to the search warrant was constitutional, or alternatively, the Court should apply the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984).

**I.  Reasonable suspicion**

Although defendant's motion raises many issues, it is the Court's view that the threshold question of whether the officers had reasonable suspicion to stop and frisk Castaneda is dispositive.[11] "The government bears the burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement." *Job*, 871 F.3d at 860. An investigatory stop does not violate the Fourth Amendment "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 30). "Reasonable suspicion requires 'specific, articulable facts' which, together with

---

[11] Defendant makes persuasive arguments that the initial detention amounted to an arrest because officers surrounded Castaneda in the back of the pizza shop with their weapons drawn and restrained Castaneda by holding his wrists behind his back. However, the Court finds it unnecessary to resolve this question and assumes *arguendo* that the initial detention was a *Terry* stop and that the officers arrested Castaneda later in the detention after finding the knife and drugs.

9

'objective and reasonable' inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (quoting *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989)). The reasonable suspicion analysis "must look at the 'totality of the circumstances' of each case to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citation omitted). "Reasonable suspicion must be based on more than an officer's 'inchoate and unparticularized suspicion or hunch.'" *Id.* (quoting *Terry*, 392 U.S. at 27). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the totality of the circumstances . . . ." *Alabama v. White*, 496 U.S. 325, 330 (1990) (internal citation omitted).

Defendant contends that the officers lacked reasonable suspicion because the tip provided by the group of men was not particularized, was provided under suspicious circumstances by suspicious individuals, and did not report an emergency. Defendant argues that the tip did not come from a reliable source because the tipsters were known to Officer Ruetti "from prior police contacts" and at least one of them was a suspected drug dealer. *See* Ruetti Decl. ¶ 6. Defendant argues that the tip was not specific, and instead consisted of men repeating the word "gun" while saying something about a "white t-shirt" and "gangster" and pointing up the street at a group of men.[12] Defendant notes that the men did not report their basis of knowledge for the tip, nor did they claim to have *seen* anyone with a gun (or brandishing a gun). Defendant also argues that even if anyone in the reporting group was frantic or agitated, that fact was significantly undercut

---

[12] Defendant's reply states that there were nine men in the accused group. Reply at 2 (Dkt. No. 23), citing Narayan Decl., Ex. 4 (surveillance video at 7:38) (Dkt. No. 16-1). The Court has reviewed that portion of the surveillance video, which appears to be shot from the north-to-south direction on Hyde Street. The footage shows between seven and ten men who may be part of a group (the men are somewhat spread out). *See generally id.* at 4:12-8:09 (footage from Turk Street showing a "group" of men walking east on Hyde Street to corner of Turk and Hyde Streets; footage from a different area on Turk Street shows the group encountering a second "group" of men at the intersection, and then the first group walking north on Hyde Street and the second group flags down the patrol car; footage from Hyde Street showing the first group of men walking up Hyde Street, followed later by Officer Ruetti, who is closely followed by the tipster group). The government's papers and declarations do not state how many men were in the first group.

by the tipster group's decision to directly and closely follow Officer Ruetti up Hyde Street towards the group accused of possessing a gun. Defendant further argues that to the extent there was any specificity about the tip – the reference to a "white t-shirt" – that should have directed the police away from Castaneda because he was wearing all black clothing. Defendant also argues that the officers' actions demonstrated "an utter disregard for the lack of particularity in the tip" because prior to detaining Castaneda, officers stopped and frisked three other individuals, including a man wearing a red hat even though no one in the group of men walking up Hyde Street was seen wearing a red hat.

The government contends that Officer Ruetti had reasonable suspicion to believe that Castaneda was armed and dangerous because the civilian tip provided by the group of men had substantial indicia of reliability. The government argues that Officer Ruetti reasonably relied on the information provided by the group of men because he recognized some of the witnesses and believed he could track them down later if needed. The government asserts that Officer Ruetti made an in-person assessment of the witnesses' demeanor and believed that they were genuinely frantic and fearful, and that "the tip was made nearly contemporaneously with the precipitating event, as the witnesses pointed to a group of men not even a block away." Gov't Opp'n at 7 (Dkt. No. 15). The government also argues that the "the occurrence of these events in a high-crime area" and "defendant's evasive behavior" also contributed to reasonable suspicion. *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding the fact that defendant was holding an "opaque bag" in "an area of heavy narcotics trafficking," combined with the defendant's "unprovoked flight upon noticing the police," provided reasonable suspicion to conduct a *Terry* stop).

When evaluating whether an informant's tip can provide a basis for reasonable suspicion, the Ninth Circuit has instructed:

> Courts look to several factors to determine the reliability of an informant's tip. First, a known informant's tip is thought to be more reliable than an anonymous informant's tip. That is because an anonymous informant typically cannot be questioned about the basis for knowing the information or motive for providing the tip, nor can the anonymous informant be held accountable for providing false information in violation of the law. Second, an informant with a proven track record of reliability is considered more reliable than an unproven informant. Third,

11

the informant's tip is considered more reliable if the informant reveals the basis of knowledge of the tip—how the informant came to know the information. Finally, a tip that provides detailed predictive information about future events that is corroborated by police observation may be considered reliable, even if the tip comes from an anonymous source. Predictive information that reveals a detailed knowledge of an individual's intimate affairs is more reliable than predictive information that could be observed by the general public, and such self-verifying detail is considerably more valuable if it relates to suspicious activities than if it relates to innocent activities.

*United States v. Rowland*, 464 F.3d 899, 907-08 (9th Cir. 2006) (internal citations omitted). In addition, "when the tip is provided in a face-to-face encounter, even when the informant is unidentified," the tip is generally considered more reliable. *See United States v. Palos-Marquez*, 591 F.3d 1272, 1275 (9th Cir. 2010).

In *Rowland,* the Ninth Circuit held that an informant's tip had several indicia of reliability where the informant "made himself known to the DEA agents, and the agents met with the informant personally," "the informant did not have any apparent motive to fabricate the tip, and could presumably have been held accountable if his information proved to be false," and "[t]he informant, although not of proven reliability, gave a general description of Rowland, predicted Rowland's future travel from Hawaii to Guam, and accurately stated that Rowland was on probation in Hawaii." *Rowland*, 464 F.3d at 908. In addition, "the DEA agents corroborated the informant's tip when they contacted the probation office in Hawaii and confirmed that Rowland lived in Hawaii and was on probation there. Rowland's criminal background, provided by the probation office, revealed past drug convictions." *Id.* In *Palos-Marquez*, the Ninth Circuit held that an in-person tip to a Border Patrol agent from an unidentified UPS driver was reliable because "the driver risked losing his anonymity by speaking face-to-face with Agent Simon, who was able to observe his appearance and affiliation with UPS, and who could have asked the driver for identification had it seemed necessary," "[the agent] could judge the UPS driver's demeanor and evaluate his credibility," and the agent "knew that the informant was a UPS driver who had worked a designated route at a certain time on the day of Palos-Marquez's stop . . . [and] the informant likely could be held accountable if the information proved to be false."[13]

---

[13] The Ninth Circuit recounted the facts in *Palos-Marquez* as follows:

12

After evaluating the totality of the circumstances and applying the legal framework set forth above, the Court concludes that the officers lacked reasonable suspicion to stop and frisk Castaneda. Although the government asserts that the high-crime location and Castaneda's "evasive" behavior supported reasonable suspicion, the majority of the government's argument hinges on the reliability of the tip. However, the tip provided by the group of men lacked the indicia of reliability necessary to support the *Terry* stop. Citing *Palos-Marquez*, the government emphasizes that the tip was provided in-person and that the tip was made "nearly contemporaneously" with the precipitating event. The in-person nature of the tip does, under *Palos-Marquez*, weigh somewhat in favor of its reliability. However, Officer Ruetti states in his

---

> The investigatory stop at issue occurred on Otay Lakes Road, which is an east-west road five miles north of the United States/Mexican border in an area described as notorious for alien smuggling. As United States Border Patrol Agent Staunton drove around a sharp bend in the road, he saw a dark-colored Dodge Ram pickup truck traveling west in his eastbound lane. The pickup was attempting to pass a westbound UPS truck. Staunton veered to avoid a collision with the pickup, which passed him and continued west. Staunton testified the pickup was traveling "faster than normal" given the conditions of the road.
>
> When the UPS truck passed Staunton, its driver gestured to get Staunton's attention regarding the pickup. Staunton testified that his knowledge of the area's connection with alien smuggling and the atypically fast speed at which the pickup was traveling, coupled with the UPS driver's gesture, caused him to suspect that the pickup might be loaded with contraband. He radioed to Border Patrol intern agents Simon and Martinez, who were situated farther west on the same road, to be on the lookout for the pickup that was "driving erratically [and] that almost ran [him] off the road." Within seconds, Simon radioed to Staunton that he had a visual of the truck. One minute later, the UPS driver pulled over at Simon's location and reported that he had seen the pickup load up with several suspected illegal aliens. Simon immediately radioed back to Staunton, informing him of the UPS driver's report. Simon did not obtain the UPS driver's name or license plate number.
>
> Staunton then put a call out over the radio to agents in the area, describing the make and model of the pickup and the UPS driver's report. Within minutes of the broadcast, Agent Padron saw the pickup traveling west on Otay Lakes Road at a high rate of speed, as described by the report. When the pickup stopped at the traffic light, an unmarked car of plain-clothes Border Patrol agents ("BIC" agents) was able to pull alongside it, and reported that its occupants looked "nervous and shaky." Approximately five minutes after Padron had first seen the pickup, he and the other agents initiated a stop. They found four illegal aliens in the pickup that Palos-Marquez was driving.

*Palos-Marquez*, 591 F.3d at 1273-74 (fn. omitted).

13

1  declaration that he "recognize[d] some of the men in the reporting group from prior police
2  contacts in the Tenderloin. In particular, I had previously suspected one of the reporting men of
3  being involved in drug distribution in the Tenderloin." Ruetti Decl. ¶ 6. Thus, the reporting men
4  consisted of (1) some men Officer Ruetti did not recognize; (2) some men Officer Ruetti
5  recognized from "prior police contacts"; and (3) a suspected drug dealer. The reporting men had
6  no track record of reliability, and to the contrary, a tip provided by a combination of unknown
7  individuals and persons who were known to Officer Ruetti through prior "police contacts" should
8  have been considered with some degree of skepticism. Unlike the tipsters in *Rowland* and *Palos-
9  Marquez* who did not have an apparent motive to lie, the tipsters here – a group of men who
10 included a suspected drug dealer and others known through "police contacts" – may very well
11 have had a motive to lie about other individuals or a group of alleged "gangsters." Further, while
12 the witnesses' "frantic" demeanor could be considered as bolstering the reliability of the tip, the
13 fact that the entire tipster group of men immediately and closely followed Officer Ruetti up Hyde
14 Street toward the first group of men further undercuts the reliability of the tip. *Cf. Rowland*, 464
15 F.3d at 908 ("The informant in this case provided sufficient detail to dispel concerns that the tip
16 was a hoax."); *see also White*, 496 U.S. at 333 (Stewart, J., dissenting) (expressing concern that if
17 a generalized tip is sufficient to create reasonable suspicion, "[a]nybody with enough knowledge
18 about a given person to make her the target of a prank, or to harbor a grudge against her, will
19 certainly be able to formulate a tip about her").

20 In addition, the tip utterly lacked detail and did not contain any predictive information that
21 could be verified by the police. Unlike the tips in *Rowland* or *Palos-Marquez*, which contained
22 specific identifying information about a particular person or vehicle, here the tipsters did not
23 provide a name or a specific description of any individual who allegedly had a gun, nor did the
24 tipsters provide any other details regarding the event giving rise to the tip. Officer Ruetti's
25 declaration states that the reporting men were "primarily Hispanic and speaking in broken
26 English" and that neither he nor Officer Daggs spoke Spanish. Ruetti Decl. ¶ 6. Officer Ruetti
27 states that "[t]he men were shouting about a gun and pointing Northward, up Hyde street, towards
28 another group of men. I heard one of the men say the word 'gangster,' and I recall one of the

14

United States District Court
Northern District of California

1  other men saying something about a white T-shirt." *Id.* Officer Ruetti "attempted to get
2  additional details about what had happened, but due to the language barrier and the frantic
3  demeanor of the men," he was "only able to comprehend that at least one of the men in the other
4  group had a gun." *Id.* To the extent there was any specificity, one of the tipsters said "something"
5  about a "white t-shirt." *Id.* It is undisputed that Castaneda was wearing all black clothing.
6  Indeed, the record shows that based upon this generalized tip, police officers stopped and frisked
7  at least four individuals: (1) a man wearing a white t-shirt; (2) a man wearing a white baseball hat;
8  (3) a man wearing a red hat; and (4) defendant, who was wearing all black clothing. There is
9  nothing in the information provided by the tipsters that would provide a "particularized and
10 objective basis for suspecting legal wrongdoing" by Castaneda. *Arvizu*, 534 U.S. at 273; *see also*
11 *United States v. Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by
12 some objective manifestation that the person stopped is, or is about to be, engaged in criminal
13 activity."); *Thomas*, 211 F.3d at 1189-90 (holding FBI tip to police officer that officer "might
14 want to pay particular attention to a certain house" based on "a suspicion that there was a
15 possibility that there might be some narcotics" there did not create reasonable suspicion because
16 "[t]he FBI's information was devoid of specifics: no information about the occupants of the house,
17 vehicles involved, any particular suspicious conduct, or the kind of narcotics at issue").

18 Officer Ruetti states that based upon the tip, he "assessed the situation to be an
19 emergency." *Id.* Significantly, however, the tipsters did not say that they *saw* anyone with a gun
20 or that someone brandished a gun or threatened someone with a gun, nor did they explain "their
21 basis of knowledge for the tip – how [they] came to know the information." *Palos-Marquez*, 591
22 F.3d at 1277. In *Palos-Marquez*, the UPS driver "relayed his tip near to where he had observed
23 the events, and agents stopped a pickup fitting the driver's description within minutes of his
24 statement" and the driver "had first-hand knowledge of the crime when he reported that he had
25 seen the pickup load up with several suspected illegal aliens." *Id*.

26 Here, the tipster group simply reported that someone in a group walking down the street
27 may have had a gun; there was no specific contemporaneous event – such as the brandishing of a
28 gun – that was reported. Instead, the tipsters were "shouting about a gun and pointing Northward,

15

up Hyde Street, towards another group of men." Ruetti Decl. ¶ 6. In *Florida v. J.L.*, 529 U.S. 266 (2000), the Supreme Court held that there is no "firearm exception" to the reasonable suspicion requirement for a *Terry* stop. In *J.L.*, "an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. Nothing was known about the informant. *Id.* Police officers were dispatched to the bus stop and saw three black males "just hanging out" and one of the males was wearing a plaid shirt. *Id.* "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements." *Id.* The officers frisked the three individuals and found a gun in J.L's pocket. *Id.*

The Supreme Court held that the officers lacked reasonable suspicion to stop and frisk J.L. The Court held that the anonymous tip "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* at 271. "All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* The Court rejected the argument that the tip was reliable because its description of the suspect's visible attributes proved accurate, stating "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272. The Court also rejected the assertion "that the standard *Terry* analysis should be modified to license a 'firearm exception.' Under such an exception, a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing. We decline to adopt this position." *Id.* The Court explained,

> Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms. Several Courts of Appeals have held it *per se* foreseeable for people carrying significant amounts of illegal drugs to be carrying guns as well. . . . If police officers may properly conduct *Terry* frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics.

16

*Id.* at 272-73 (internal citation omitted).

Here, although the tip was not anonymous like the tip in *J.L.*, in many respects it is similar and arguably even less reliable. The tipsters in this case "provided no predictive information" and "neither explained how [they] knew about the gun nor supplied any basis for believing [they] had inside information." *Id.* at 272. In *J.L.* the tip provided a physical description of J.L., which the Court found insufficient; here, there was no description other than "white t-shirt" and "gangster" while the tipsters pointed to a group of men walking up the street. *Cf. Ybarra v. Illinois*, 444 U.S. 85, 90-91 (1980) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."); *see also Aguilera v. Baca*, 510 F.3d 1161, 1176 (9th Cir. 2007) (Kozinski, C.J., dissenting) ("That one member of a group may have committed a crime doesn't establish probable cause to arrest everyone in that group.") Finally, even though the tip here was in-person, it was given primarily in a language not spoken by either officer and the tipsters were of questionable credibility given that they were known to Officer Ruetti through "police contacts" and included a suspected drug dealer.

The government also argues that Officer Ruetti had reasonable suspicion to support the *Terry* stop because the Tenderloin is a high-crime area and because Castaneda engaged in evasive behavior when he saw the police. However, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124. In the absence of a reliable tip indicating that Castaneda was (or was about to be) engaged in criminal behavior, his presence in the high-crime Tenderloin neighborhood is not, on its own, sufficient to create reasonable suspicion.

With regard to Castaneda's alleged "evasive" behavior, Officer Ruetti states that as he got out of his patrol vehicle on O'Farrell Street to make contact with Castaneda and two other men, "Castaneda turned and looked back at me. He had a startled expression on his face that I would describe as a 'deer in the headlights' look. He immediately separated himself from the other two men and quickly entered" the pizza shop. Ruetti Decl. ¶ 8. Officer Ruetti also states that he

1    believed Castaneda was attempting to evade him because Castaneda went directly to the back
2    supply room rather than attempting to order food. *Id.*

3    The Court notes that Castaneda disputes Officer Ruetti's description of his behavior. *See* Castaneda Decl. ¶¶ 4-6. However, even assuming Officer Ruetti's description is correct, the Court finds that Castaneda's behavior, in the totality of the circumstances, did not provide a basis for the *Terry* stop. It is undisputed that Officer Ruetti's patrol car drove the wrong way down O'Farrell Street against traffic, with the siren and lights on. The business surveillance footage from O'Farrell Street submitted by the government shows several people turning around and/or stopping to look at the patrol car. That Castaneda would have a startled expression on his face under those circumstances is not particularly surprising. "Quickly entering" a pizza shop is not the same as "headlong flight," *Wardlow*, 528 U.S. at 124. Castaneda walked to the rear of the shop where the bathroom was located. Officer Ruetti does not state that Castaneda was hiding or crouched in the back room. The alleged evasive behavior here is, in the Court's view, minimal. If the tip possessed greater indicia of reliability and contained specific information about Castaneda, the Court would afford Castaneda's alleged evasive behavior greater weight. However, because the Court finds that the tip provided no basis to suspect that Castaneda was engaged in criminal activity, the Court gives little consideration to Castaneda's alleged evasiveness. *Cf. United States v. I.E.V.*, 705 F.3d 430, 438 (9th Cir. 2012) (noting that "mere nervous or fidgety conduct and touching of clothing" is not enough to establish reasonable suspicion).

## II.    Exclusionary rule

Because the Court concludes that there was no reasonable suspicion to support the initial *Terry* stop and frisk of defendant, the search of Castaneda's person was unlawful, and the evidence discovered during the search, including the drugs and the key fob, must be suppressed. *See Job*, 871 F.3d at 862. The warrantless search of the Dodge Dart directly flowed from this initial unlawful search, as officers only searched the Dodge Dart by seizing the key fob from Castaneda and walking through the neighborhood until they found a car that responded to the key. "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal

18

search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations omitted). "It 'extends as well to the indirect as the direct products' of unconstitutional conduct." *Id.* (*quoting Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). Thus, the evidence seized during the warrantless search of the vehicle shall be suppressed.

"All evidence [the officers] seized during the illegal warrantless search[es] was tainted and should not have been included in the affidavit for a search warrant." *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987). "The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant." *Id.* "A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *Id.* Here, once all reference to the drugs and firearm discovered in the warrantless searches is excised from the search warrant affidavit, the remaining statements of fact in the affidavit would not support probable cause to issue the warrant.

The government argues that the Court should apply the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984), to the search warrant affidavit. However, the Ninth Circuit has held that the *Leon* good faith exception does not apply in circumstances where an officer conducts a warrantless search in violation of the Fourth Amendment. In *Vasey*, the Ninth Circuit explained,

> The *Leo*n Court held that the Fourth Amendment exclusionary rule should not be applied so as to bar the use in the prosecutor's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid. *Leon* at 900, 926, 104 S.Ct. at 3409, 3422. The *Leon* analysis and good faith exception are not applicable to this case.
>
> The fact that Officer Jensen conducted a warrantless search of the vehicle which violated Vasey's Fourth Amendment rights precludes any reliance on the good faith exception. In *Leon*, the officer presented lawfully obtained evidence to a neutral magistrate. The magistrate erroneously found that this evidence established probable cause and consequently issued a warrant. Subsequently, a reviewing court ruled that the evidence presented to the magistrate did not establish probable cause and the warrant should not have been issued. The evidence obtained in the warrant search was deemed admissible by the *Leon* Court, however, because the officer acted in good faith. The officer acted in good faith both in gathering and presenting evidence to a neutral magistrate. The only error in the entire process

> was the magistrate's erroneous finding that the evidence established probable cause.
>
> The instant case differs. Officer Jensen conducted an illegal warrantless search and presented tainted evidence obtained in this search to a magistrate in an effort to obtain a search warrant. The search warrant was issued, at least in part, on the basis of this tainted evidence. The constitutional error was made by the officer in this case, not by the magistrate as in *Leon*. The *Leon* Court made it very clear that the exclusionary rule should apply (i.e. the good faith exception should not apply) if the exclusion of evidence would alter the behavior of individual law enforcement officers or the policies of their department. *Leon* at 918, 104 S.Ct. at 3418. *See also United States v. Whiting*, 781 F.2d 692 (9th Cir.1986) (finding *Leon* inapplicable to warrantless search). Officer Jensen's conducting an illegal warrantless search and including evidence found in this search in an affidavit in support of a warrant is an activity that the exclusionary rule was meant to deter.

*Id.* at 789. The *Vasey* court further held that "the magistrate's consideration of the evidence does not sanitize the taint of the illegal warrantless search." *Id.* Accordingly, the good faith exception under *Leon* is not applicable in this case, and the evidence seized from Castaneda's residence pursuant to the search warrant is also suppressed.

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS defendant's motion to suppress. Accordingly, the Court SUPPRESSES the evidence seized from the warrantless searches of Castaneda's person and the Dodge Dart, and the evidence seized from Castaneda's residence pursuant to the search warrant.

**IT IS SO ORDERED**.

Dated: February 7, 2019

SUSAN ILLSTON
United States District Judge